**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| TINA WOLF, DALE WOLF, TAMI GOCHNOUR, PAUL CHEVRES, GARRETT SHAFFER, ALLISON HAMMOND, DONNA GREGG, GERALD GLENN GREGG, MEGAN HALTER, JOHN MUSICK, RALPH VANNOY, JR., and EDITH PUGH,<br><br>         Plaintiffs,<br><br>      v.<br><br>W.L. GORE & ASSOCIATES, INC.,<br>The Corporation Trust, Incorporated<br>2405 York Road, Suite 201<br>Lutherville, Maryland 21093-2264<br><br>         Defendant. | C.A. No.: 1:23-cv-280<br><br>COMPLAINT AND<br>DEMAND FOR JURY TRIAL |

**FIRST AMENDED COMPLAINT**

**NOW COME** the Plaintiffs, Tina Wolf, Dale Wolf, Tami Gochnour, Paul Chevres, Garrett Shaffer, Allison Hammond, Donna Gregg, Gerald Glenn Gregg, Megan Halter, John Musick, Ralph Vannoy and Edith Pugh, (collectively "Plaintiffs"), by and through the undersigned counsel, and complaining of the Defendant, W.L. Gore & Associates, Inc., ("Gore" or "Defendant"), hereby allege and state as follows:

**THE PARTIES**

1.      Plaintiff Tina Wolf ("Ms. Wolf") is an adult individual who resides at 2356 Singerly Road, Elkton, MD 21921 (the "Wolf Residence").

2.      Plaintiff Dale Wolf ("Mr. Wolf") is an adult individual who resides at the Wolf Residence.  Mr. Wolf is the spouse of Ms. Wolf.

3.      Plaintiff Tami Gochnour ("Ms. Gochnour) is an adult individual who resides at 2350 Singerly Road, Elkton, MD 21921 (the "Chevres Residence").

4.      Paul Chevres ("Mr. Chevres") is an adult individual who resides at the Chevres Residence.  Mr. Chevres is the spouse of Ms. Gochnour.

5.      Plaintiff Allison Hammond is an adult individual who resides at 182 Fair Hill Drive, Elkton, MD 21921 (the "Hammond Residence").

6.      Garrett Shaffer is an adult individual that resides at the Hammond Residence.

7.      Donna Gregg ("Mrs. Gregg") is an adult individual who resides at 456 Cherry Hill Road, Elkton MD 21921 (the "Gregg Residence").

8.      Gerald Glen Gregg ("Mr. Gregg") is an adult individual who resides at the Gregg Residence. Mr. Gregg is the spouse of Mrs. Gregg.

9.      Megan Halter ("Mrs. Halter") is an adult individual who resides at 2440 Singerly Rd., Elkton MD 21921 (the "Halter Residence").

10.     John Musick ("Mr. Musick") is an adult individual who resides at 2262 Singerly Road, Elkton MD 21921 (the "Musick Residence").

11.     Ralph Vannoy, Jr. ("Mr. Vannoy") is an adult individual who resides at 2276 Blueball Road, Elkton MD 21921 (the "Vannoy Residence").

12.     Edith Pugh  ("Mrs. Pugh") is an adult individual who resides at 141 Brewster Bridge Road, Elkton MD 21921 (the "Pugh Residence").

13.     W. L. Gore & Associates, Inc., is a Delaware corporation that identified its principal place of business as 555 Paper Mill Road, Newark, Delaware 19711.  Defendant Gore is authorized to conduct business within the State of Maryland. Defendant Gore's registered agent for service in the state of Maryland is: The Corporation Trust, Incorporated, 2405 York Road, Suite 201, Lutherville, Maryland 21093-2264.

14.     Gore is the owner and operator of an industrial property, comprised of approximately 20.78 acres of improved real property located in Elkton, Maryland with a mailing address of 2401 Singerly Road, Elkton, Maryland 21921 (the "Cherry Hill Facility" or "Cherry Hill").

15.     Gore is a privately held, multinational manufacturing and materials science company, with annual revenues of $4.5 billion.  Gore specializes in the development of membrane and polymer and fluoropolymer products, as well as their manufacture and application to a variety

of industries and sectors, including healthcare, life sciences, mobile electronics, automotive,

textiles and apparel, and aerospace. This includes "Gore-Tex" fabric.

16.     According to Gore's website:

At Gore, we believe that the integrity of environmental, health and safety performance aligns with our Gore brand promise of *Together, improving life* for all Gore Associates, customers and the communities we serve. We carefully consider the effects of our products and operations on the environment, as well as on the health and well-being of people. We are committed to using our materials science expertise to create products that improve the quality of life and address sustainability challenges for generations to come. Our expectation is that the value of our innovations is greater than the environmental and social impact of our products and operations.[1]

17.     Gore employs, upon information and belief, approximately between 250 and 300 people at the Cherry Hill Facility.

18.     At all times relevant to the facts and allegations set forth herein, Gore: (a) maintained licenses and registrations to do business in the State of Maryland; (b) regularly conducted business in the State of Maryland; (c) maintained continuous and systematic contacts with the State of Maryland; (d) committed acts and/or omissions within the State of Maryland which gave rise to the instant action; (e) injected their products and/or materials into the stream of commerce within the State of Maryland; and/or (f) acted as one entity with a parent or subsidiary which, at all times relevant to the facts and allegations set forth herein, had continuous and systematic contacts with the State of Maryland.

## JURISDICTION AND VENUE

19.     The state law claims asserted in this Complaint are brought pursuant to Maryland common law.

20.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1), because Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

---

[1] https://www.gore.com/about/the-gore-story?view=responsible-enterprise.

21.     This Court has personal jurisdiction over Defendant, as Defendant caused tortious injury in the State of Maryland, performed acts or omissions within the State of Maryland which caused such tortious injury, regularly conducts and/or solicits business within the State of Maryland, engages in other persistent courses of conduct in the State of Maryland, and/or derives substantial revenue from goods, services, and/or manufactured products used and consumed within the State of Maryland.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) as Gore is considered a resident of the State of Maryland, under 28 U.S.C. § 1391(c)(2), and thus is an entity over which this Court has personal jurisdiction. Venue is further proper under 28 U.S.C. § 1391 (b)(2), because the events and/or omissions of Gore giving rise to Plaintiffs' claims occurred in Maryland, and the property which is the subject of the action is situated in Maryland.

## JURY DEMAND

23.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable.

## GENERAL FACTUAL ALLEGATIONS

### Background Regarding PFOA, APFO and Use in the Creation of Gore's PTFE and ePTFE

24.     Polymers are substances with molecular structures consisting chiefly, or entirely, of large numbers of similar units bonded together, such as synthetic organic materials used as plastics or resins.

25.     Fluoropolymers are fluorocarbon-based polymers with multiple carbon fluorine bonds, which are characterized by a high resistance to solvents, acids, and bases, making them ideal for use in waterproof products, such as Gore-Tex fabric.

26.     Many of Gore's most important and lucrative products are based on a fluoropolymer called polytetrafluoroethylene ("PTFE"), otherwise known as Teflon®, which Gore uses to create thousands of different products and applications.

27.     In connection with Gore's PTFE manufacturing processes, it processes materials comprising dangerous per- and polyfluoroalkyl substances ("PFAS").  Further, in some cases, Gore uses and has used dangerous toxic PFAS compounds in its manufacturing processes.

28.     PFAS are a large group of over four thousand (4,000) chemical compounds, including but not limited to ammonium perfluorooctanoate ("APFO"), perfluorooctanoate ("PFO"), perfluorooctane sulfonic acid ("PFOS"), and perfluorooctanoic acid ("PFOA"), colloquially known as ("C8").

29.     Due to their chemical structure, PFAS are biologically and chemically stable in the environment and resistant to environmental degradation processes, and thus remain present in the environment long after they are initially released.

30.     PFAS bioaccumulate in living organisms, primarily in the blood serum, kidney, and liver, and remain in the human body.

31.     PFOA is a fluorinated organic chemical that is part of a larger group of chemicals referred to through this Complaint as PFAS or perfluorochemical compounds (PFCs). This group of compounds also includes PFOS.

32.     PFOA, and all PFCs, are human-made chemicals that are not found in nature. The ammonium salt form of PFOA, APFO, is highly water soluble and its particulate matter quickly and easily dissolves into rainwater and other precipitation to form PFO- or PFOA, which then readily percolates down through soils to contaminate groundwater.

33.     APFO is the ammonium salt form of PFOA. It dissociates in water to form PFO⁻ and is protonated to form PFOA.[2]

34.     APFO acts as a "surfactant" or "emulsifier"—a chemical additive which is used to create high molecular weight PTFE, and which enables the PTFE particles to be suspended in water.

35.     Generally, surfactants and emulsifiers like APFO are chemical compounds that act as wetting agents, lowering surface tension between gasses and liquids and reducing the volatility

---

[2] For purposes of this Complaint, APFO, PFO and PFOA will all be generically referred to as "PFOA".

of chemical reactions, thereby allowing for chemical reactions which are otherwise difficult to achieve. These are mixed with large reactor vessels or basins to form PTFE.

36.    APFO, introduced as the surfactant/emulsifier, takes the physical form of a white powder/white solid at ambient temperature. When added to water, it takes the form of a soapy, detergent-like liquid, utilized in the process of creating PTFE. This process is called aqueous dispersion polymerization.

37.    When APFO is released to the environment and interacts with aqueous solution in the environment, it undergoes an immediate chemical reaction which converts it to PFOA. When APFO enters the human body, such as via inhalation of APFO air emissions, a similar chemical reaction occurs.

38.    APFO/PFOA exists as a vapor when heated during the process of PTFE manufacturing and coating. When PTFE coatings are heated, APFO/PFOA vaporizes out of the PTFE dispersion and exits through stacks in manufacturing facilities. When hot PFOA vapor exits through the stacks, it cools and coagulates within minutes to form micro-sized particulates ranging from 0.1 μm to 1 μm in diameter that are then carried by the wind until they settle to the ground (dry deposition) or are washed by precipitation (wet deposition).

39.    Gore gained notoriety for its efforts in further stretching and expanding post extrusion PTFE, thereby orienting the web-like molecules and making the PTFE even stronger and more durable.

40.    Stretched and expanded PTFE is referred to as "ePTFE".

41.    While ePTFE's oriented, web-like structure is ideal for high-strength applications, its porous structure also enables applications involving filtration and breathability.

42.    Moreover, due to its chemical structure, PTFE and ePTFE are biologically and chemically stable and are largely resistant to degradation. Such bio-retentive, bio-accumulative, and bio-persistent characteristics make PTFE and ePTFE ideal components of strong, durable consumer products.

43.    In March of 1995, Gore expanded its prior utilization of APFO in the production of its PTFE and ePTFE.

44.    Upon information and belief, Gore utilized materials comprised of post-polymerization PTFE waste scraped from polymerization vessels at a separate PFAS manufacturing facility and recycled for use by Gore.

45.    Upon information and belief, this material contained staggering levels of C8, including approximately 10% raw APFO.

46.    At this time, Gore was well aware of the toxic nature of APFO/PFOA, and that this material contained a substantially higher level of raw PFOA than proportions of surfactants previously introduced and utilized at Gore.

47.    Gore also knew, at this time, that heating even the smallest quantities of the new material in the testing or production process to temperatures appropriate for ePTFE membranes would result in extreme PFOA emissions.

48.    For a period of many years following 1995, Gore directed its employees to purchase large quantities of this material to utilize in testing and production.

49.    For a period of many years, Gore directed its employees to perform testing and production processes utilizing the material containing 10% raw PFOA, which resulted in substantial toxic environmental exposures to the surrounding Elkton, Maryland community, including Plaintiffs.

50.    Gore represented to its employees that the new material was harmless.

51.    In approximately the fall of 1996, new material was no longer available for purchase by Gore.

52.    Despite this knowledge, Gore instructed its employees from the fall of 1996 through the year 1997 to continue utilizing the large quantities of the new material it had already purchased.

**Toxicity of PTFE and ePTFE products developed with APFO/PFOA**

53.    While PTFE and ePTFE possess commercially desirable physical characteristics related to strength and durability, PFOA used in the manufacture of PTFE and ePTFE is highly

carcinogenic and otherwise toxic and/or harmful to human beings (and other living creatures) who

inhale, ingest, or otherwise absorb PFOA.

54.     Specifically, PFOA is readily absorbed after ingestion or inhalation exposure, binds to albumen in an individual's blood serum, and is concentrated in the liver and kidneys.

55.     When released into the environment, PFOA is also particularly persistent in water and soil and, because of its solubility in water, can readily migrate from soil to groundwater.

56.     Moreover, due to its resistance to biodegradation, hydrolysis and photolysis and high resistance to virtually all methods of traditional purification and/or eradication, PFOA remains in the environment—and in the human body—long after its initial discharge and/or consumption/absorption.

57.     PFOA is especially concerning from a human health standpoint precisely because it can stay in the environment and in the human body for long periods of time.

58.     Myriad health risks associated with exposure to PFOA exist, and such risks are present even when PFOA is ingested at, seemingly, very low levels (less than 0.004 part per trillion (ppt)).

59.     Specifically, PFOA is associated with, *inter alia*, increased risk in humans of testicular cancer, kidney cancer, prostate cancer, endometrial/uterine cancer, breast cancer, along with thyroid disease, ulcerative colitis, pregnancy-induced hypertension, Type-2 diabetes in women, pre-eclampsia, developmental delays in children, and other health conditions.

60.     Upon information and belief, PFOA has the ability to cause other cancers and illnesses not yet associated with human exposure.

**History of PFAS Industry use, sale and production of PFOA-containing Products and Knowledge of Toxicity**

61.     Gore began using PFOA in the manufacture of its PTFE products at its Cherry Hill Facility in the late 1970's.

62.     Gore: (a) purchased PTFE resin and aqueous PTFE dispersions containing high amounts of PFOA and/or APFO for use in Gore's manufacturing processes and later (b) created and/or used raw PFOA and/or APFO to create its own PTFE aqueous dispersions and resins for

use in manufacturing. Upon information and belief, Gore spent hundreds of millions of dollars to purchase thousands of tons of PTFE resin each year until it began its own production.

63.    When Gore began manufacturing its own PTFE resin, in which it utilized raw APFO as a surfactant or wetting agent, it also sold, traded, and provided PTFE resin to other manufacturers.

64.    Prior to 2015, Gore utilized PFOA to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food, and other materials such as cookware that are resistant to water, grease, or stains.

65.    In 2006, the United States Environmental Protection Agency ("EPA") implemented a global stewardship program that included eight major perfluoroalkyl manufacturing companies. The stewardship program's goal was (i) to achieve a 95% reduction of global facility emissions of PFOA and chemicals that degrade to PFOA by 2010, and (ii) to eliminate PFOA from emissions and products by 2015. According to EPA, all eight companies that participated in the program have attested that they phased out PFOA, and chemicals that degrade to PFOA, from emissions and products by the end of 2015.

66.    There are a number of health risks associated with exposure to PFOA, and these risks are present even when PFOA is ingested at, seemingly, very low levels (0.004 parts per trillion (ppt)).

67.    PFAS manufacturers became aware of the toxicity of PFOA in the 1950s and began researching the potential health effects associated with the compound.

68.    A study published in or about 1961 found that PFAS induced a range of toxic effects, including anesthesia, depression, inhibition of enzymes, metabolic effects, and effects on blood pressure and the sympathetic nervous system.

69.    PFAS manufacturers knew by the 1970s, at the latest, that PFAS were widely present in human blood and were not easily removed from the body or bloodstream.

70.    In 1976, two academic researchers published a report that showed widespread contamination of human tissues in non-occupationally exposed persons with organofluorine

compounds (organic compounds that contain the carbon-fluorine bond) which were likely derived

from commercial sources such as PFOA. The authors questioned whether consumer products containing these compounds could be the source, but PFAS manufacturers pled ignorance and instructed them not to speculate.

71.     In the late 1970s, the PFAS industry began monitoring the effect of occupational exposure to PFAS on the health of employees working in PFAS manufacturing facilities.

72.     Despite observing indications of ill-health effects in their employees who were exposed to PFAS, PFAS manufacturers agreed not to notify the EPA of these findings under Section 8(e) of the Toxic Substances Control Act because there were no *established* adverse health effects associated with their findings.

73.     Around the same time, the PFAS industry was conducting studies in laboratory animals that demonstrated dangerous health effects associated with exposure to PFOA, including, but not limited to: 1) liver enlargement and death in rats at high doses; 2) increases in plasma enzyme levels indicative of cellular damage in dogs and death at high doses; and; 3) liver enlargement and corneal opacity in rats that inhaled doses for only four hours.

74.     By the late 1970s, the PFAS industry was aware of "compound-related effects" (effects related to PFOA) in both Rhesus monkeys and Charles River CD rats, with more severe effects observed in the monkeys, including increased incidences of kidney and liver damage.

75.     By 1979, the PFAS industry was also aware of a 90-day oral study in Rhesus monkeys that had been administered dosage levels of 0, 3, 10, 30 and 100 mg/kg/day of PFOA, with the monkeys receiving the highest dose dying during weeks 2-5 of the study, three of the monkeys receiving the 30 mg/kg/day dose also died during weeks 7-12 of the study while all monkeys exposed at this dose showed signs of toxicity in the gastrointestinal tract and other adverse changes. Monkeys dosed at the two highest levels also showed weight loss from the first week of the study.

76.     Early PFOA toxicology studies were summarized in 1980 and the liver was highlighted as a target organ, while effects on the immune system were also reported. The study reports were not submitted to the EPA until the year 2000.

77.     In 1980, PFOA animal toxicity studies were published and were accessible to PFAS manufacturers.

78.     By 1980, PFAS manufacturers had internally confirmed that PFOA is toxic and bioaccumulative and were aware that the rate of first-time myocardial infarctions (heart attacks) in company foreman at least one PFAS manufacturing facility was almost double what would have been expected.

79.     Materials from a C-8 Communications meeting dated July 31, 1980, stated: "After 25 years of handling C-8, we see no damage among workers. However, the potential is there – C-8 has accumulated in the blood. Because of this accumulation we have decided to undertake programs to minimize accumulation of C-8 in the blood in the workers."

80.     By 1981, the PFAS industry was aware that PFOA in the blood serum of a pregnant woman could cross the placenta to the fetus. PFOA was found to be present in the umbilical cord blood of an infant born to an employee and in the blood of an infant born to another employee.

81.     By 1981, the PFAS industry was also aware that PFOA ingestion caused birth defects in rats, and had found birth defects in two of seven children born to PFOA exposed workers in at least one PFAS manufacturing facility, both of whom had eye defects.

82.     An experimental study conducted in 1981 showed birth defects in the eye lens of rats exposed to PFOA. A total of three teratology studies were carried out, all of them finding lens abnormalities in exposed animals, which upon information and belief, prompted PFAS manufacturers to remove all female employees from PFOA-exposed jobs without informing them of the reason for their transfer.

83.     By the early 1980's, PFAS manufacturers were sharing their internal studies concerning health and environmental effects associated with exposure to PFOA with other manufacturers within the industry, but concealed this knowledge from the public at large.

84.    By 1984, the PFAS industry was aware that PFOA in its particulate form was being emitted in high volumes from smokestacks at facilities that used PFAS in their manufacturing processes and deposited in soil throughout the surrounding communities.

85.    Upon information and belief, Dr. Jack Hegenbarth ("Hegenbarth") was an employee and later executive within the PFAS industry during the years of 1965 to 1989, with not only awareness, but high-level knowledge of the research related to the concerns surrounding the toxic health effects of PFOA.

86.    On or around May 21, 1984, Hegenbarth and others met to review and discuss engineering studies and other evidence showing:

    a.    Aerial PFOA emission amounts from a PFAS manufacturing facility;

    b.    Aqueous PFOA emission amounts from a PFAS manufacturing facility;

    c.    Residual PFOA emission amounts from products manufactured at a PFAS manufacturing facility;

    d.    *Inter alia*, birth defects in unborn animals exposed to PFOA;

    e.    Expected PFOA amounts in the blood of employees working at a PFAS manufacturing facility;

    f.    Estimated half-life of PFOA in human blood;

    g.    Methods by which a PFAS manufacturing facility might reduce employee exposure to PFOA;

    h.    Proposed PFOA exposure limits. Notably, upon information and belief, such meeting and associated discoveries resulted in the transfer and/or termination of certain pregnant employees who had been exposed to PFOA.

87.    A memo summarizing this meeting provides, *inter alia*:

a. "The review was held with Besperka, Bennett, Riddick, Gleason, **Hegenbarth**, Serenbetz, Raines, Kennedy, Von Schriltz, and Ingalls in attendance";

b. "There was agreement that a departmental position needed to be developed concerning the continuation of work directed at elimination of [PFOA][3] exposures off plant as well as to our customers and the communities in which they operate";

c. "There was consensus reached that the issue which will decide future action is one of corporate image, and corporate liability. Liability was further defined as the incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation";

d. "Currently, none of the options developed are, from a fine powder business standpoint, economically attractive and would essentially put the long-term viability of this business segment on the line";

e. "Looking ahead, legal and medical will most likely take a position of total elimination";

f. "The product group will take a position that the business cannot afford it";

g. "The end result, in my opinion, will be that we eliminate all [PFOA] emissions at our manufacturing sites in a way yet to be developed which does not economically penalize the business, and addresses the [PFOA] emission and exposures of our dispersion customers";

h. "Some information which we just developed 5/21/84 is that detectible levels of [PFOA] are in both the Lubeck, W.V. and the Little Hocking, Ohio water systems";

---

[3] Throughout the summary, PFOA is referred to as "C-8."

j.    "With the development of our current fine powder expansion plan, which takes capacity up to 8.2 MMAP, through a combination of equipment and recipe changes, [PFOA] air emissions will rise from the current 12,000 lbs. / yr. to 25,200 lbs. / yr.  The increase for the combined divisions will increase from a current 16,000 to 25,200 lbs. / yr. or a net 9,200 lbs. due to a 4,000 lb. offset with the implementation of the TBSA program.  This will increase further with the installation of the third dryer (12 MMAP fine powder) to about 37,000 lbs. / yr.";

j.    "[PFOA] will now become a major issue on all further project work in the fine powder area, starting with the Wilmington Scope Review 6/29/84.  In preparation for that review I have requested the ESO ground level concentration study be redone using the new production volumes and recipe (45% solids).  Also we have included in the draft scope of work a new small exhaust system in the front end of the dryer bed to try to catch most of the [PFOA] in a much lower volume air stream.  The project will put this stream to the exhaust stack.  The intent is to first reduce in plant exposure, and second leave a future capability for treatment of this relatively concentrated stream."

k.    "I believe we need to sit back down with the new information we now have, and the feedback we have gotten from these meetings and jointly with Putnam review our plant position.  Raines at one point had rejected reduction as an option.  This needs to be included in our thinking again."

88.    By no later than June 14, 1984, the PFAS industry was aware that the average biological half-life of PFOA in human blood was approximately 2.4 years, but with considerable variability between individuals, and that male operators in at least one PFAS manufacturing facility complained about difficulty in achieving pregnancy with their wives.

89.    By 1986, a cancer morbidity study among employees exposed to PFAS showed male hourly wage workers had an incidence of bladder cancer deaths at more than double what would have been expected.

90.     By 1987, a study conducted of at least one plant where fluorochemicals were used found increases above expected rates of death from female breast cancer, bladder cancer, Hodgkin's lymphoma, lung cancer, urinary cancers in men, and cirrhosis of the liver in women.

91.     By 1988 at the latest, the PFAS industry was aware that PFOA was associated with increased rates of carcinogenicity in rats, including testicular cancer.

92.     In 1989, a study of cancer incidence among employees at a PFAS manufacturing facility detected an increased incidence of leukemia, buccal cavity and pharynx cancer, kidney and other urinary cancers, including bladder cancer and multiple myeloma.

93.     By 1989, the PFAS industry was aware that there were increases in other cancers in employees at PFAS manufacturing facilities as well, including pancreatic, lung, kidney, and bladder cancers and Hodgkin's lymphoma.

94.     Upon information and belief, on or about 1989, Hegenbarth was transferred to Gore to head a broad range of Gore research, development, and manufacturing activities, and in particular the management of many Gore issues involving C8.

95.     With Hegenbarth's transfer, beyond continuing to operate as a purchaser and processor of products containing APFO/PFOA, Hegenbarth spearheaded efforts enabling Gore to polymerize PTFE using APFO.

96.     Upon information and belief, due to his intimate familiarity with the toxic and otherwise harmful nature of PFOA gained while working as an employee and executive within the PFAS industry, Hegenbarth was ideally suited to manage imminent PFOA-related issues in Gore's new production projects.

97.     Hegenbarth assembled his team at Gore Cherry Hill with former colleagues and fellow leaders in the PFAS industry, including Patty McGuigan ("McGuigan"), a world-renowned expert in surfactants and surface chemistry. McGuigan worked with Hegenbarth directly during Hegenbarth's early years at Cherry Hill through 1994.

98.     In or about March 1996, Richard Baillie ("Baillie"), who previously worked with Hegenbarth in an executive role at a different PFAS manufacturing facility where he was present

joined Hegenbarth's team at Gore Cherry Hill.

99.    Prior to joining Gore, Richard Baillie was copied on a September 28, 1994 memorandum regarding "C8 Ammonium Perfluorooctanoate Fluorosurfactant Strategies and Plans." He was instructed to return the draft copy for destruction after he read it. He was instructed to work with suppliers and others, and "use outside resources to leverage efforts." He was also instructed to "Initiate C-8 recycle and recovery from U.S. Gore".   Attached to the memorandum was a copy of Roger Zipfel's September 15, 1994 report ("The Zipfel Report").

100.    The Zipfel Report, Appendix E, documented liver changes and testicular cancer in rats exposed to inhalation of C8.  Appendix E states "[t]he concern around the long term effects of ammonium perfluorooctanoate is related to its persistence in human blood".  Appendix E also notes a possible increase in prostate cancers related to APFO.

101.    Upon information and belief, due to Baillie's intimate familiarity with the toxic and otherwise harmful nature of PFOA, he was seen to be ideally suited to manage imminent PFOA-related issues and served a "key role" at Gore.

102.    By 1990, the PFAS industry was aware that there was a statistically significant excess of deaths among workers exposed to PFAS due to urinary cancers, a statistically significant increased incidence of bladder cancer in male employees, a statistically significant increase in mortality from cancer of the digestive organs among female employees, and female employees continued to have a statistically significant elevation in the incidence of cirrhosis of the liver. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

103.    A 1990 internal industrial hygiene data review demonstrated a correlation between PFOA levels in the air and PFOA blood levels in workers who inhaled contaminated air. It was found that levels in blood were an order of magnitude higher than the levels in the air, which demonstrated that PFOA bioaccumulated inside the human body. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

104.   In a report dated April 12, 1990, entitled "Investigation of Hormonal Mechanisms for C-8 Induced Leydig Cell Adenoma," which reviewed data derived from an animal study, the authors concluded that the induction of Leydig cell adenoma (testicular tumors) related to PFOA exposure was likely to be hormonally mediated. Upon information and belief, such findings were known to Hegenbarth and Gore.

105.   By October of 1990, the PFAS industry was aware that PFOA induced a dose-related decrease in serum testosterone, which appeared to document a direct effect of PFOA on the testes. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

106.   A memo authored by PFAS industry employees dated March 15, 1991, reported on a meeting at which employees decided that "[a] warning of potential C-8 hazards (especially from condensate) should be included in material safety data sheet (MSDS) for all products in which C-8 concentration is 0.1% or more." The memo also indicates that all other "product literature which contains safety or health warnings should be revised to be consistent with MSDS." Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

107.   In the unpublished 1992 thesis of Frank Gilliland, MD, who studied the clinical pathology parameters of 111 male workers at a PFAS manufacturing facility in Cottage Grove, MN, Dr. Gilliland found a positive correlation between PFOA exposure measured as serum total organic fluorine and estradiol (an adverse effect) and a negative correlation with free testosterone (also an adverse effect) with this association being stronger in older men. Dr. Gilliland concluded that PFOA may affect male reproductive hormones. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

108.   Dr. Gilliland's 1992 unpublished thesis from his worker study also showed thyroid effects in production workers that were associated with organofluorine concentrations in worker blood serum. A positive correlation was seen between organic fluorine and the thyroid stimulating hormone in serum, a sign of thyroid deficiency. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

109.    PFAS manufactures learned that doses of PFOA as low as 300 ppm caused statistically significant increases in adenomas and carcinoma of the liver and pancreas, and Leydig cell adenomas in the testes. By 1993, the PFAS industry was aware of two animal studies that found that PFOA caused testicular cancer and cancer at three different anatomical sites among laboratory animals exposed to PFOA. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

110.    By 1993, the PFAS industry also knew that a mortality study of PFAS production workers showed a 3-fold excess occurrence of prostate cancer in workers employed more than ten years. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

111.    In 1995, the UK company, Imperial Chemical Industries, strongly espoused that APFO should be considered an animal carcinogen, as the benign tumors observed are simply early lesions that ultimately lead to malignant tumors.  However, other PFAS industry representatives disagreed. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

112.    By 1996, the PFAS industry was aware that certain testing linked PFOA to DNA damage. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

113.    In or about 1996, certain PFAS manufacturers jointly commissioned studies to assess the effects of PFOA on humans by exposing monkeys to the chemical. By November of 1998, the monkeys in this study were suffering from severe health effects. By 1999, even the monkeys receiving the lowest dose of PFOA were suffering adverse health effects, including liver toxicity, and it was determined that no observable effect level (NOEL) could not be found in non-human primates. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

114.    As of January of 1997, the PFAS industry was aware of a hormonally mediated mechanism for the Leydig cell tumors in rat testes. In a document entitled "Hazard Characterization for Human Health in C8 Exposures, CAS Registry No. 3825-26-1," Lisa B. Biegel, Ph.D., Senior Research toxicologist at the DuPont Haskell Laboratory, wrote: "[t]he

studies summarized below support a hormonally mediated mechanism for the Leydig cell tumorigenesis: C8 produces an increase in hepatic aromatase activity, which elevates serum estradiol concentrations, which in turn modulates growth factors in the testes, which results in tumor formation. . . . The mechanism of tumorigenesis is not completely understood, and therefore relevance to humans cannot be completely ruled out. However, it is known that non-genotoxic compounds (such as C8) produce Leydig cell tumors by altering the endocrine system." Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

115.    A paper published in 1997 by John C. Cook and Eric D. Clegg, concluded: "[o]ccurrence of Leydig cell adenomas in test species is of potential concern as both a carcinogenic and reproductive effect if this mode of induction and potential exposure cannot be ruled out as relevant for humans [and] . . . it should be assumed that humans are potentially susceptible." Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

116.    Upon information and belief, on or about April 27, 1998, Lisa Walton, of Gore wrote to Roger Zipfel inquiring as to how Gore could introduce a process that would effectively remove APFO vapors from air emissions. Upon information and belief, Gore also subsequently sought to determine how to utilize liquid waste treatment methodology in order to treat the APFO Gore was routinely dumping.

117.    At the time of Lisa Walton's letter, PFOA in its particulate form was being emitted in high volumes from smokestacks, with no, or with insufficient mechanisms and destruction capacities to effectively remove the large quantities of APFO being processed at the Cherry Hilly Facility. The emissions were deposited in soil and water sources throughout the surrounding communities.

118.    In 1999, calculations by a PFAS industry employee showed that a "general population member with [PFOA levels of] 70 ppb (in one's blood) could have 36 times more in his liver" due to life-time accumulation. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

119. In April of 2000, a PFAS manufacturer rejected its own occupational health official's recommendation for a comprehensive medical surveillance program for employees exposed to PFOA, noting that establishing such a program "could have significant repercussions at any of our other sites that handle . . . similar products." Upon information and belief, such information was known to Hegenbarth, Baillie and Gore.

120. In or about 2000, the EPA notified a PFAS manufacturer that it intended to pursue more rigorous regulation of the perfluorinated chemicals it manufactured. Shortly thereafter, that PFAS manufacturer publicly announced that it was voluntarily withdrawing from the perfluorinated chemical market, including its manufacturing of PFOA. Two of the reasons cited for the manufacturer's decision were PFOA's (1) bio-persistence and (2) toxicity. Upon information and belief, such information was known to Hegenbarth, Baillie and Gore.

121. On or about February 23, 1999, Elizabeth B. "Betsy" Downs ("Ms. Downs"), an Employee at Gore, who lived directly across from the Gore Cherry Hill Facility at 2416 Singerly Road, Elkton MD 21921-000, died of cancer-related complications.

122. Upon information and belief, aqueous PFOA emissions from the Cherry Hill Facility contaminated the well on Ms. Downs' property, which was located near Cherry Hill.

123. In or about July 19, 2000, Gore, with knowledge of PFOA contamination at the site, purchased the home of its former employee, Ms. Downs, and subsequently razed the property to the ground.

124. In October of 2001, Paul M. Hinderliter, Ph.D. and Gary W. Jepson, Ph.D. of the DuPont Haskell Laboratory, drafted a paper entitled "A Simple, Conservative Compartmental Model to Relate Ammonium Perfluorooctanoate (APFO) Exposure to Estimates of Perfluorooctanoate (PFO-) Blood Levels in Humans." The paper described calculations which showed that ingestion of 1 ppb of PFOA in drinking water corresponded to human PFOA blood levels 300 times higher. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

125. In March of 2002, a PFAS manufacturer's website, titled "C8 INFORM" continued to state that PFOA had no adverse health effects and misrepresent the decades of studies and scientific data related to health effects associated with C8 exposure.

126. By 2003, the PFAS industry was aware of at least one mortality study and a mortality registry of workers exposed to PFAS, which reported excess bladder cancer incidence with high exposure jobs and an excess of kidney cancer deaths over expected levels, respectively. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

127. Baillie and Lisa Walton of Gore were members of an organization called the Fluoropolymers Manufacturers Group ("FMG") of the Society of the Plastics Industry, Inc., ("SPI"), with Baillie serving as the group's Chairman in 2003.

128. Membership criteria required each member either be (1) a processor of APFO containing dispersion resins or (2) a compounder of APFO-containing dispersions and resins.

129. On March 14, 2003, FMG, wrote to the EPA providing information about uses of fluoropolymers made with perfluorooctanoic surfactants. The EPA was concerned about the data provided to the EPA on PFOA, and the fact that PFOA was detected in the human blood in the general population.

130. On October 31, 2003, the group changed its name to Fluoropolymers Processors Group ("FPG").

131. An email of the October 31, 2003 meeting minutes from FMG discussed the FMG Mass Balance Program, in which participating companies would participate in a written survey about processes associated with dispersion and Barr would subsequently perform a sample collection at the responding facility. Baillie and Lisa Walton of Gore were copied on the memo of the October 31, 2003 meeting minutes, which was attached to the email.

132. In January of 2005, a final draft, titled "Dispersion Processor Material Balance Project", prepared by Barr Engineering Company, KHA Consulting LLLC, Keller and Heckman LLP, was circulated ("Barr Report"). Upon information and belief, this report was finalized in February of 2005. Upon information and belief, prior drafts of this report were circulated and

Lisa Walton, prior to the January 2005 final draft, and a draft existed with findings in December 2004.

133.    The Barr Report itself said "The number who agreed to participate was such that all could be accepted into the Study."

134.    On December 21, 2004, Gore purchased multiple parcels of land surrounding the Cherry Hill Facility, including two parcels on Leeds Rd, Elkton MD 21921-000, and 10.07 acres of land on Singerly Rd., Elkton MD 21921-0000. Upon information and belief, this was in response to Gore's knowledge that the Barr Report would publish information related to the environmental contamination caused by APFO emissions.

135.    The Bar Report states, "[t]he FMG decided to study this group of processors because AFD were known to contain small amounts of PFOA salt known as ammonium perfluorooctanoate (APFO)." The Barr Report found that based on the results of sampling an analysis 62% of the APFO from AFD is destroyed and approximately 25% ends up in the air, water, and solid waste streams.

136.    Shortly after the final Barr Report was published, on March 8, 2005, Gore purchased additional property near the Gore Cherry Hill Facility, including, but not limited Milburn Farm Orchards. The Milburn Farm Orchards was subsequently razed to the ground.

137.    In 2006, the EPA reached a settlement agreement with a PFAS manufacturer to resolve the manufacturer's alleged reporting violations under the Toxic Substances Control Act regarding its fluorochemicals. The agreement did not require the manufacturer to admit to the violations, but the company agreed to pay a penalty in excess of $1.5 Million for 244 separate alleged violations. Upon information and belief, such information was known to Hegenbarth, Baillie and Gore.

138.    In 2009, a follow-up study of workers exposed to PFOA showed an increase in prostate cancer incidences in workers with moderate to high exposures. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

139.    Toxicology studies show that PFOA is readily absorbed after ingestion or inhalation exposure. PFOA has an elimination half-life in the human body of 2 to 9 years. PFOA binds to albumen in the blood serum and is concentrated in the liver and kidneys. Indeed, PFOA is especially concerning from a human health standpoint precisely because it can stay in the environment and in the human body for long periods of time. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

140.    PFOA is associated in medical literature with increased risk in humans of testicular cancer, kidney cancer, prostate cancer, non-Hodgkin's lymphoma, pancreatic cancer, and ovarian cancer, as well as thyroid disease, high cholesterol, high uric acid levels, elevated liver enzymes, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions. Studies of PFOA exposure in animals have shown the ability to cause other cancers not yet associated with human exposure. The EPA has also advised that exposure to PFOA may result in developmental effects to fetuses during pregnancy or to breastfed infants, liver damage, and various immunological effects. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

141.    In May 2006, the EPA Science Advisory Board stated that PFOA cancer data are consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans." These health conditions can arise months or years after exposure to PFOA. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

142.    On February 2, 2022, Gore, with full knowledge of all of the above, wrote a letter opposing legislative efforts to place restrictions on PFAS substances in the State of Maryland through its lobbyist. In its letter, Gore argued that "the definition of PFAS (per- and poly-fluoroalkyl substances) is overly broad and includes high molecular weight fluoropolymer such as PTFE, which are highly stable, too large to be bioavailable, and do not have potential to become widespread in the environment".

**Gore's Knowledge of PFOA Environmental Contamination**

143.   By the early 1960s, the PFAS industry understood that groundwater near waste disposal sites would be contaminated with PFAS. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

144.   By 1966, the PFAS industry was aware that PFAS, including PFOA, move rapidly in groundwater and migrate into nearby bodies of water. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

145.   By the mid-1970s to early 1980s, the PFAS industry was also aware of certain groundwater and surface water sources located near PFAS manufacturing facilities that were contaminated with PFAS. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

146.   By 1984, the PFAS industry was aware that PFOA in particulate form exhausted from stacks at PFAS manufacturing facilities would be carried by the wind well beyond the plant property line and deposited in the soil throughout the community. The PFAS industry also learned that drinking water supplies in communities around manufacturing plants processing and utilizing PTFE products containing APFO were contaminated with PFOA (1) from air emissions of APFO from the plant and subsequently, deposited on ground, dissolved in rainwater and then percolated into the groundwater and (2) from direct discharges of liquids containing PFOA into the Ohio River. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

147.   By 1984, the PFAS industry was aware that PFOA was present in the public drinking water supply in areas located near PFAS manufacturing facilities. Samples of tap water reported to be from public drinking water supplies near those facilities found that PFOA was present in drinking water samples collected. Upon information and belief, this decision was shared with Hegenbarth, Baillie and Gore.

148.   Despite this knowledge, the PFAS industry, including Gore, chose not to alert the public or Plaintiffs.

149.   By June of 1984, the PFAS industry was aware that water supplied by a town located "up-river" from a PFAS manufacturing plant, contained PFOA levels of at least 500 ppt.

Because of the location of the contaminated wells in in relation to the facility and the direction of flow of the river, manufacturer knew that this contamination was caused by PFOA released into the air from its manufacturing facility. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

150.    By 1985, the PFAS industry was aware that PFOA was leaching into groundwater beneath digestion ponds that had previously been used to dispose of PFOA-contaminated sludge and was migrating through the groundwater under the plant into the public drinking water supply where PFOA levels were detected as high as 1,500 ppt. These PFOA levels increased to 1,900 ppt in 1987 and 2,200 ppt in 1988. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

151.    By 1987, air modeling documented PFOA in the ambient air beyond the fence line of a PFAS manufacturing facility that resulted from emissions drifting with the wind into nearby communities. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

152.    Upon information and belief, PFAS manufacturers and Gore shared information about the environmental contamination potential of PFAS such as PFOA and PFOS from as far back as the 1980s and the information alleged to be known by one was made known to the other.

**PFOA Drinking Water Limits**

153.    In 2009, the EPA identified PFOA, among other PFAS, as an emerging contaminant of concern and issued a provisional health advisory stating that short-term (weeks to months) exposure to PFOA at a concentration of 400 ppt can cause human health effects. The provisional health advisory stated that the discovery of PFOA in drinking water above the advisory level should result in the discontinued use of the water for drinking or cooking.

154.    In May 2016, the EPA replaced its 2009 provisional health advisory with a new lifetime health advisory level (HAL). The 2016 HAL established that the presence of PFOA in drinking water at a concentration greater than 70 ppt should require water systems to undertake

remediation and public health officials to promptly notify consumers about the health risks associated with exposure to PFOA. EPA health advisories are non-enforceable on the states.

155.    The EPA also established a Reference Dose (RfD) of 0.000002 mg/kg/day. The Reference Dose is defined by the EPA as an "estimate (with uncertainties spanning perhaps an order of magnitude) of the daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime."[4]

156.    One June 15, 2022, the EPA announced a new interim lifetime drinking water HAL for PFOA of 0.004 ppt.

157.    The EPA's new interim HAL for PFOA is based on human studies finding associations between exposure to PFOA and/or PFOS and effects on the immune system, human development, and cancer, and will be in place until the EPA's PFAS National Primary Drinking Water Regulation is in effect.

158.    In the absence of federally enforceable standards for PFAS, several states have developed draft, proposed, or final health based regulatory or guidance levels for PFAS.

159.    In 2016, Vermont established a drinking water advisory of 0.02 ppb (20 ppt).

160.    The State of Vermont's Department of Public Health has adopted a Maximum Contaminant Level (MCL) standard of 20 ppt for both PFOA and PFOS, and warns residents "PFAS could be taken up by vegetables. Do not boil water. Boiling water will not remove PFAS and may concentrate them". [5]

161.    In May 2017, Minnesota established a health guidance value for PFOA in drinking water of 0.035 ppb (35 ppt).

162.    In November of 2017, New Jersey announced it will adopt a new health-based MCL for PFOA in drinking water of 14 ppt, a decrease from its previously set guidance level of 40 ppt based upon the recommendation of the New Jersey Drinking Water Quality Institute, which was based upon the latest research on the adverse health effects of PFOA.

---

[4] United States EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 4-1 (May 2016).
[5] https://www.healthvermont.gov/sites/default/files/documents/pdf/ENV_DW_PFAS.pdf

163.    On December 18, 2018, the New York State Drinking Water Quality Council recommended that the State's Department of Health adopt MCLs of 10 ppt for both PFOA and PFOS.

164.    In 2021, Illinois established a preliminary health-based guidance value for PFOA of 2 ppt.

165.    In 2021, Michigan set a MCL for PFOA in drinking water of 8 ppt.

166.    The State of Maryland has applied the EPA's HAL for PFOA and PFOS in drinking water.

167.    In 2020, Maryland began sampling public water treatment systems to identify water systems with levels of PFOA and PFOS exceeding the EPA's HAL. The state has continued its sampling using a phased approach and has worked with water systems with exceedances of PFOA and/or PFOS to take affected water systems offline, collect additional samples, and issue public notices.

168.    Maryland has also set an advisory level for another PFAS compound, PFHxS, in drinking water and site-specific fish consumption advisories for PFOS.

169.    The website for Maryland's Department of the Environment ("MDE") describes PFAS, including PFOA, as chemicals that "are persistent in the environment and the human body, meaning they do not break down easily and accumulate over time".  In general, animal studies have found that animals exposed to PFAS at high levels resulted in changes in the function of the liver, thyroid, pancreas and hormone levels.

170.    MDE has published on its website that, "According to the Agency for Toxic and Disease Registry (ATSDR) some, but not all, studies in humans with PFAS exposure have shown that certain PFAS may: affect growth, learning and behavior of infants and older children, lower a woman's chance of getting pregnant, interfere with the body's nature hormones, increase cholesterol levels, affect the immune system, [and] increase the risk of cancer."

*Gore PTFE Processing at Cherry Hill*

171.    Gore regularly processed large quantities of PTFE, and aqueous PTFE dispersion, heavily contaminated with C8 at its Cherry Hill Facility, in Elkton, Maryland.

172.    The majority of PTFE processing at Cherry Hill involved the large-scale conversion of PTFE fine powders (which were contaminated with C8) into PTFE and PTFE membrane.

173.    Upon information and belief, at all times relevant to the facts and allegations set forth herein, the vast majority of Gore's worldwide wet PTFE paste processing occurred at Cherry Hill and was directly carried out by approximately two hundred (200) Gore employees.

174.    PTFE paste processing transformed PTFE fine powder into extremely strong networks of web-like, interconnected PTFE fibers known as "ePTFE."

175.    Such paste processing began with PTFE fine powder, which was: (a) blended with a measured amount of lubricant; (b) compressed into pellets; (c) heated; (d) extruded into tape; (e) calendared into rolls; and (f) dried at high temperatures.

176.    The result of such PTFE processing was a range of complex products, including but not limited to Gore-Tex products.

177.    Gore also engaged in an ePTFE sintering process, which involved high temperature heat treatment and/or melting of ePTFE membranes to ensure their molecular stability.

178.    Such machines heated up large quantities of PTFE ranging up to thousands of pounds of material per hour.

179.    Upon information and belief, Gore knew that such ePTFE polymer contained toxic PFOA residuals which were substantially certain to injure those who were exposed.

180.    "Extrusion" is a process in which material is fed through a hopper into an extruder, essentially a rotating screw surrounded by a heated barrel, where it is mixed, and pumped through a die. The die gives the part its shape. At Gore, extrusion specific to PTFE is based upon ram extrusion, coming out as a tape.

181.    Over time, Gore developed multiple extruders for its ePTFE polymer, which contained toxic PFOA residuals. Gore processed tens of millions of pounds of PTFE and ePTFE a year.

182.   In or around December of 1993, Bill Mortimer ("Mortimer"), began to head Gore's experimentation with "filled products."

183.   "Filled products" were combinations or blends of traditional PTFE and other materials, such as platinum powder and nickel.

184.   Combining such materials changed the properties of the chemical compounds and expanded the potential uses of PTFE.

185.   Mortimer's experiments revealed that blending PTFE with such other materials created filled products which displayed remarkably unique properties.

186.   Mortimer, at the behest of Gore, increased the overall manufacturing capabilities of Gore's Filled Products Division. Moreover, in examining Mortimer's production facility there existed:

    a.  PTFE sludge on the floor which, upon information and belief, contained approximately 1-2% PFOA;

    b.  APFO-filled post-coagulation wastewater being directly discharged into the county sewer system; and

    c.  Post-coagulation resin being dried on racks in large, walk-in ovens, emitting extreme amounts of PFOA vapor directly into the atmosphere.

187.   In or around May of 1990, Mortimer and Hegenbarth, at the direction of Gore, began assessing the manufacturing capabilities of the Filled Products Division.

188.   As the Filled Products Division began performing testing trials, it began crafting instrumentation capable of performing extrusions with filled products.

189.   This process included manual filled products extrusions, which involved extruding PTFE co-coagulated from raw, heavily PFOA-contaminated dispersion mixed with various powders.

190.   Such extrusion also involved heating of associated materials to elevated temperatures, which caused constant smoking of highly contaminated lubricant.

191.   In or around the same time, Gore began the "Snowstorm Project."

192.    The Snowstorm Project involved blending and/or combining different batches of PTFE resins, creating PTFE compounds with unique properties.

193.    Throughout the Snowstorm Project, Gore performed mandatory, routine blood testing on employees on the Snowstorm team.

194.    Moreover, upon information and belief, Gore relocated certain pregnant employees away from the Snowstorm process area. This practice occurred in various operations in which pregnant employees were terminated or relocated.

195.    At all times relative to the facts and allegations set forth herein, Gore has represented that PFOA was inert (non-toxic).

196.    Pursuant to the 1984 Memo, dielectric drying was used for its potential benefit in PFOA recovery.

197.    Upon information and belief, Cherry Hill was targeted at finding ways to make PTFE fine powder while minimizing PFOA emissions, based on Gore's knowledge of PFOA's high toxicity, consistent with the goals of the 1984 Memo.

198.    There were two unlined ponds located at the Gore Cherry Hill Facility.  Upon information and belief, Gore was generating large amounts of effluent, which was comprised of large quantities of APFO, and dumping that effluent into either the 1) a wastewater treatment system; or 2) the unlined ponds.

199.    At a subsequent point, Gore dug up the soil from the ponds, paved over the ponds, and built a structure over top (parking lot). Gore then added a third pond with concrete lining.

200.    In sum, upon information and belief, both the Snowstorm Project and the Filled Products Division resulted in:

    a.  Dumping large quantities of PFOA-laden wastewater into groundwater that supplies drinking water in wells, and into the public sewage system;

    b.  Emitting large quantities of PFOA vapors into the atmosphere during the drying process.

**FACTS RELATED TO PLAINTIFFS**

201.     Mr. Wolf and Mrs. Wolf are the owners and residents of the Wolf Residence and have resided there since 2006. Mr. and Mrs. Wolf's children resided at the Wolf Residence for various points of time through their lives.

202.     The Wolf Residence utilized a well system for use and delivery of its potable water up from the time they moved into their residence up and through February 9, 2023, at which time the Wolf Residence was hooked up to public water.

203.     The water of the well system for the Wolf Residence was tested on or about December 5, 2022 for PFOA contamination. The results of said test revealed PFOA levels ranging from 680 to 710 ppt of PFOA. The water of the well system for the Wolf Residence was tested again on or about March 24, 2023. The results of said test revealed PFOA levels ranging from 600 to 610 ppt of PFOA. The water from the Sump Pump tested at 450 ppt for PFOA.

204.     Located on the real property of the Wolf Residence is a stream that that flows into, and is a tributary of, Little Elk Creek.

205.     Mr. and Mrs. Wolf, and their family have used and continue to utilize the stream for recreational purposes.

206.     The stream located on the real property of the Wolf Residence was tested on or about December 5, 2022 for PFOA contamination. The results of said test revealed levels of PFOA at 770 ppt.

207.     The Wolf Residence is located approximately 0.15 miles from the Cherry Hill Facility.

208.     Mr. and Mrs. Wolf drank, bathed in, cooked with, irrigated their property with, washed their hands with, brushed their teeth with, provide(d) their animals with, and otherwise used water from wells of the Wolf Residence, drawn from the groundwater contaminated by Gore.

209.     Mrs. Wolf has suffered from thyroid conditions since 2013.

210.     Mrs. Wolf's thyroid conditions were proximately caused by consumption and use of PFOA contaminated water and drinking water, drawn from the groundwater contaminated by Gore.

211. Mr. Chevres is the owner of the Chevres Residence and he and Ms. Gochnour have resided there since 2003. Mr. Chevres and Ms. Gochnour's children resided at the Chevres Residence for various points of time through their lives.

212. The Chevres Residence utilized a well system for use and delivery of its potable water from the date that Mr. Chevres and Ms. Gochnour moved into the Chevres Residence through

213. The water of the well system for the Chevres Residence was tested on or about December 19, 2022 for PFOA contamination.  The results of said test revealed PFOA levels ranging from 620 to 640 ppt of PFOA. The water of the well system for the Chevres Residence was tested again on or about March 24, 2023. The results of said test revealed levels of PFOA at 500 ppt.

214. The Chevres Residence is located approximately 0.16 miles from the Cherry Hill Facility.

215. Ms. Gochnour and Mr. Chevres and their family drank, bathed in, cooked with, irrigated their property with, washed their hands with, brushed their teeth with, provide(d) their animals with,  and otherwise used water from wells of the Chevres Residence, drawn from the groundwater contaminated by Gore.

216. In or about 2021, Mr. Chevres was diagnosed with Prostate Cancer.

217. Mr. Chevres' Prostate Cancer was proximately caused by consumption and use of PFOA contaminated water and drinking water, drawn from the groundwater contaminated by Gore.

218. Ms. Hammond is an owner and resident of the Hammond Residence.

219. Mr. Shaffer is the son of Ms. Hammond and a resident of the Hammond Residence. Mr. Shaffer owns a parcel of real property described as Lot No. 1 on a plat entitled "Minor Subdivision Plat, Lands of Harry E. Hammond and Roberta B. Hammond" which plat is recorded among the Plat Records of Cecil County in Plat Book PC 1117, folio 69.

220.   The Hammond Residence utilizes a well system for use and delivery of its potable water.

221.   The water of the well system for the Hammond Residence was tested on or about December 20, 2022 for PFOA contamination.  The results of said test revealed levels of PFOA at 10 ppt.

222.   The Hammond Residence located approximately 2.21 miles from the Cherry Hill Facility.

223.   Ms. Hammond and Mr. Shaffer drink, bathe in, cook with, irrigate their property with, wash their hands with, brush their teeth with, and otherwise use water from wells of the Hammond Residence, drawn from the groundwater contaminated by Gore.

224.   Ms. Hammond and Mr. Shaffer will require medical monitoring for future medical conditions, necessitated by and proximately resulting from consumption and use of PFOA contaminated water and drinking water, drawn from the groundwater contaminated by Gore.

225.   Mr. and Mrs. Gregg are the owners 456 Cherry Hill Road, Elkton MD 21921 (the "Gregg Residence").

226.   Mr. and Mrs. Gregg have lived at the Gregg Residence for approximately 29 years.

227.   The Gregg residence utilizes a well system for use and delivery of its potable water.

228.   The water of the well system for the Gregg Residence was tested on or about January 25, 2023 for PFOA contamination.  The results of said test revealed levels of PFOA at 320 ppt.

229.   The Gregg Residence is located approximately 0.2 miles from the Cherry Hill Facility.

230.   Mr. and Mrs. Gregg own several horses who are located at the Gregg Residence property. Mr. and Mrs. Gregg provide their well water to horses and several pets. One of Mr. and Mrs. Gregg's award-winning show horses who consumed the water, suddenly died.

231.   Mr. and Mrs. Gregg drink, bathe in, cook with, irrigate their property with, wash their hands with, brush their teeth with, water their horses with, provide(d) their animals with, and

otherwise use water from wells of the Gregg Residence, drawn from the groundwater contaminated by Gore.

232.     In or about 2008, Gerald Glenn Gregg was diagnosed with Colon Cancer.

233.     Glenn Gregg's Colon Cancer was proximately caused by consumption and use of PFOA contaminated water and drinking water, drawn from the groundwater contaminated by Gore.

234.     In or about October of 2022, Donna Gregg was diagnosed with Kidney Cancer.

235.     Donna Gregg's Kidney Cancer was proximately caused by consumption and use of PFOA contaminated water and drinking water, drawn from the groundwater contaminated by Gore.

236.     Ms. Halter resides at 2240 Singerly Rd., Elkton MD 21921, where she and her husband have rented a home for approximately 6 years (the "Halter Residence"). Ms. Halter's two children have also resided in their home.

237.     The water of the well system for the Halter Residence was tested on or about March 16, 2023 for PFOA contamination.  The results of said test revealed levels of PFOA at 220 ppt.

238.     The Halter Residence is located approximately 0.15 miles from the Cherry Hill Facility.

239.      The Halter residence utilizes a well system for use and delivery of its potable water.

240.     Ms. Halter and her family consume, bathe in, cook with, irrigate the Halter Residence property with, wash their hands with, brush their teeth with, and otherwise use water from wells of the Halter Residence, drawn from the groundwater contaminated by Gore.

241.     Ms. Halter's blood has a special and unique quality to it, as she has O positive blood that lacks the cytomegalovirus ("CMV"). O negative and O positive donors who are CMV negative are known as Heroes for Babies at the Red Cross because it is the safest blood for newborns & premature babies. A limited portion of the adult population has such blood.  Ms. Halter regularly donates her blood for use in premature babies who are in the neonatal intensive care unit. Ms.

Halter has donated blood several times during the period of time she was consuming water at the Halter Residence.

242.    Ms. Halter's status of consuming and using PFOA contaminated water and drinking water has impacted her ability to donate her special and unique blood for the use of newborns and premature babies.

243.    Ms. Halter suffers concerns about the status of newborns and premature babies who have previously been provided with her blood, during the time periods she consumed and otherwise utilized the PFOA contaminated water and drinking water, drawn from the groundwater contaminated by Gore.

244.    Ms. Halter and her family will require medical monitoring for future medical conditions, necessitated and proximately resulting from consumption and use of PFOA contaminated water and drinking water, drawn from the groundwater contaminated by Gore.

245.    John Musick ("Mr. Musick") is an adult individual who resides at 2262 Singerly Road, Elkton MD 21921 (the "Musick" Residence). Mr. Musick has resided at this property since 2009 with his wife, and their four children, with one additional child on the way.

246.    The Musick Residence utilizes a well system for use and delivery of its potable water.

247.    The water of the well system for the Musick Residence was tested on or about December 5, 2002 for PFOA contamination.  The results of said test revealed levels of PFOA at 160 ppt. The water of the well system for the Musick Residence was tested again on or about March 27, 2023, for PFOA contamination.  The results of said test revealed levels of PFOA at 120 ppt.

248.    The Musick Residence is located approximately 0.3 miles from the Cherry Hill Facility.

249.    Mr. Musick, his wife and children, drank, bathe in, cook with, irrigate the Musick Residence property with, wash their hands with, brush their teeth with, provide their pets with, and

otherwise use water from wells of the Musick Residence, drawn from the groundwater contaminated by Gore.

250.   Mr. Musick and his family will require medical monitoring for future medical conditions, necessitated by and proximately resulting from consumption and use of PFOA contaminated water and drinking water, drawn from the groundwater contaminated by Gore.

251.   Ralph Vannoy, Jr., ("Mr. Vannoy") is an adult individual who resides at 2276 Blueball Road, Elkton MD 21921 (the "Vannoy" Residence). He and his wife have resided at this residence for approximately the last 39 years. Prior to moving to 2276 Blueball Road, Elkton MD, 21921, Mr. Vannoy lived next door with his family.

252.   The Vannoy Residence utilizes a well system for use and delivery of its potable water.

253.   The Vannoy Residence is located approximately 2.28 miles from the Cherry Hill Facility.

254.   Mr. Vannoy drinks, bathes in, cooks with, irrigates the Vannoy Residence property with, washes his hands with, brushes his teeth with, and otherwise uses water from wells of the Vannoy Residence, drawn from the groundwater contaminated by Gore.

255.   Mr. Vannoy was a student at the Cherry Hill Middle School in the 1970's and consumed water on the premises, which at that time was on well water.

256.   The Cherry Hill Middle School is approximately 0.6 miles from the Cherry Hill Facility.

257.   Mr. Vannoy was diagnosed with Ulcerative Colitis in 2013.

258.   Mr. Vannoy's Ulcerative Colitis was proximately caused by his use and consumption of PFOA contaminated water and drinking water, drawn from the groundwater contaminated by Gore.

259.   Edith Pugh ("Mrs. Pugh") is an adult individual who resides at 141 Brewster Bridge Road, Elkton MD 21921 (the "Pugh" Residence). Mrs. Pugh has resided at the Pugh

residence with her husband for the last thirteen years. Prior to that, she resided at 302 Cherry Hill
Road, Elkton MD 21921 for approximately ten years ("Mrs. Pugh's previous Residence").

Case 1:23-cv-00280-MJM    Document 28    Filed 07/31/23    Page 37 of 55

260.    The Pugh Residence utilizes a well system for use and delivery of its potable water.

261.    Mrs. Pugh's previous residence utilized a well system for use and delivery of its potable water.

262.    The Pugh Residence is located approximately 1.36 miles from the Cherry Hill Facility.

263.    Mrs. Pugh's previous residence was approximately 0.7 miles from the Cherry Hill Facility.

264.    The water of the well system for the Pugh Residence was tested for PFOA contamination on or about March 31, 2023. The results of said test revealed levels of PFOA at 6.4 ppt.

265.    Mrs. Pugh drinks, bathes in, cooks with, irrigates her property with, washes her hands with, brushes her teeth with, and otherwise uses water from wells of the Pugh Residence, drawn from the groundwater contaminated by Gore.

266.    Mrs. Pugh was diagnosed with Breast Cancer in or about October of 2021. Mrs. Pugh also suffers from thyroid conditions.

267.    Mrs. Pugh's Breast Cancer and Thyroid conditions were proximately caused by her use and consumption of PFOA contaminated water and drinking water, drawn from the groundwater contaminated by Gore.

## CLASS ALLEGATIONS

268.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

269.    Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed classes pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4). This action satisfies the numerosity,

commonality, typicality, adequacy, predominance, and superiority requirements of those
provisions.

270.    Plaintiffs bring this class action on behalf of the following classes, as set forth
below:

a.    All individuals who are owners of real property located in the
Contamination Zone, or who were owners of real property located in the
Contamination Zone as of February 1, 2023.

b.    All individuals who (a) lived, resided, worked or attended school in
the Contamination Zone for a period of at least six months, between January 1, 1972
and the date of certification in this case; (b) during that time, ingested PFOA-
contaminated water at their residence, work or school from a PFOA-contaminated
private well within the Contamination Zone; and (c) have not been diagnosed with
testicular cancer, kidney cancer, prostate cancer, endometrial/uterine cancer, breast
cancer, thyroid disease, ulcerative colitis, pregnancy-induced hypertension, Type-
2 diabetes, pre-eclampsia, or developmental delays, as of the date this Class is
certified.

c.    All individuals who (a) lived, resided, worked or attended school in
the Contamination Zone for a period of at least six months, between January 1, 192
and the date of certification in this case; (b) during that time, ingested PFOA-
contaminated water at their residence, work or school from a PFOA-contaminated
private well within the Contamination Zone; and (c) have been diagnosed with
testicular cancer, kidney cancer, prostate cancer, endometrial/uterine cancer, breast
cancer, thyroid disease, ulcerative colitis, pregnancy-induced hypertension, Type-
2 diabetes, pre-eclampsia, or developmental delays, as of the date this Class is
certified.

271.  As referred to in the class definitions above, the "Contamination Zone" shall mean
"all properties within the State of Maryland located within 3.5 miles from the Cherry Hill Facility."

272.   Excluded from the definition of the Classes as set forth above are: (a) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors.

273.   Upon information and belief, the number of members of each Class exceeds 1,000 or more, and therefore, the Classes are so numerous that joinder of all members is impracticable.

274.   The questions of law and fact in this case are uniquely common as to all members of one or more of the Classes.

275.   There are common questions of law and fact in this action which are not only common as to the Classes, but which predominate over any question affecting only individuals.  The predominating questions include, but are not limited to:

a.   Determination of the role and responsibilities of Gore in the contamination from Gore Cherry Hill Facility.

b.   Determination and/or modeling of the migration of PFOA and other contaminants from the Cherry Hill Facility into the surrounding environment;

c.   Determination and/or modeling of the travel of PFOA and other contaminants from the Cherry Hill Facility into surrounding surface water bodies;

d.   Whether and over what periods of time Gore negligently and/or improperly emitted PFOA from the facilities it operated at the Cherry Hill Facility;

e.   Whether and over what periods of time Gore negligently and/or improperly discharged PFOA to the groundwater beneath the facilities it operated at the Gore Cherry Hill Facility;

f.   Whether and over what periods of time Defendant Gore, mishandled and disposed of PFOA waste inappropriately;

g.   Whether Gore utilized appropriate pollution controls at the facilities it operated at the Gore Cherry Hill Facility;

h.   Whether and what periods of time Gore knew or should have known that it was unreasonably dangerous to dispose of PFOA into the environment;

j.      Whether injunctive relief may be necessary to prevent current and future water pollution including necessary upgrades to the Gore Cherry Hill Facility;

k.      Whether injunctive relief may be necessary to prevent future air emissions from the Gore Cherry Hill Facility;

l.      Whether injunctive relief may be necessary to prevent the manufacturing and sale of PFOA;

m.      Whether remediation is necessary to remedy the environment and property damage caused by Gore's conduct in contaminating the groundwater and surface waters;

n.      Whether and what periods of time Gore breached a legal duty to Plaintiffs and the Classes by disposing of PFOA in the manner described herein;

o.      Whether and what periods of time Gore's breach of a legal duty caused class members' drinking water to become contaminated with PFOA;

p.      Whether and what periods of time it was foreseeable that  Gore's use of PFOA would cause class members' drinking water to become contaminated and/or unreasonably dangerous for normal and foreseeable human consumption or use;

q.      Whether and what periods of time Gore was negligent, grossly negligent, reckless and/or acted in a willful or wanton manner with respect to their manufacturing operations and pollution controls used at the facilities it operated at the Gore Cherry Hill Facility;

r.      Whether and what periods of time Gore was negligent, grossly negligent, reckless and/or acted in a willful or wanton manner with respect to its handling of wastewater generated at the facilities it operated at the Gore Cherry Hill Facility;

Whether and what periods of time the PFOA contamination described herein substantially interfered with Plaintiffs' and class members' use and enjoyment of their property;

s.      Whether and what periods of time the PFOA contamination described herein caused, and continues to cause, a continuous invasion of the property rights of Plaintiffs and the Classes;

t.      Whether and what periods of time Gore caused the devaluation of Plaintiffs' and class members' property;

u.      Whether and what periods of time Gore caused PFOA to enter, invade, intrude upon or injure the property rights of Plaintiffs and the Classes;

v.      Whether the toxic invasion and accumulation of PFOA in class members' blood constitutes an injury under Maryland law;

w.      Whether Plaintiffs and the Classes are at increased risk of illness and harm as a result of the PFOA accumulation they have sustained in their bodies from drinking municipal or private well water;

x.      Whether Plaintiffs and the Classes are at increased risk of illness and harm as a result of the PFOA accumulation they have sustained in their bodies from breathing the air near the Gore Cherry Hill Facility;

y.      Whether medical monitoring and surveillance of Plaintiffs and the Classes is reasonable and necessary to assure early diagnosis and treatment of PFOA-related illnesses and conditions;

z.      Whether early diagnosis and treatment of the conditions caused by PFOA will be beneficial to Plaintiffs;

aa.     Whether Gore's conduct warrants the imposition of punitive damages; and

bb.     Whether the Gore has been unjustly enriched by its actions.

276.    The claims of the named Plaintiffs, who are representative parties, are typical of the claims of the members of the respective Classes.

277.    Plaintiffs will fairly and adequately represent and pursue the interests of the Class. Plaintiffs understand the nature of their claims herein, have no disqualifying conditions, and will vigorously represent the interests of the Class members.

278.    Plaintiffs' counsel are experienced in Class Actions and other complex litigation. Thus, Plaintiffs' counsel will adequately represent the interests of the Class.

279.    This action is properly maintainable as a Class Action pursuant to Federal Court Civil Rule 23(b)(2) in that the Defendants have refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

280.    This action is also properly maintainable as a Class Action pursuant to Federal Court Civil Rule 23(b)(3) in that questions of law and fact common to members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy between the Classes and Gore.

281.    The commonality of issues of law and fact in this case is clear.  The questions of law and fact common to members of the Classes, set for hereinabove at paragraph 229, represent the overwhelming majority of evidence that must be presented in this case.

282.    The difficulties likely to be encountered in the management of a Class Action in this litigation are insignificant, especially when weighed against the virtual impossibility of affording adequate relief to the members of the Classes through more than a thousand separate actions, which would necessarily include evidence and testimony relating to the conduct of Gore and include testimony from a multitude of liability experts, and potentially tens of thousands of pages of exhibits.

283.   Plaintiffs and the Classes also seek a declaration that Gore acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health and safety of Plaintiffs and members of the Classes.

284.   Plaintiffs and Classes (A) and (B) seek to maintain in the alternative to certification under Rule 23(b)(2) or 23(b)(3), Plaintiffs and the classes seek to maintain a class action with respect to particular issues, including: (1) Gore's role in creating the aforementioned PFOA contamination; (2) the foreseeability of the subsequent injuries resulting from Gore's emissions containing PFOA; (3) Gore's, abnormally dangerous activity related to the discharge and emission of PFOA from the Cherry Hill Facility and whether Gore is strictly liable for same; (4) whether the PFOA contamination from the Cherry Hill Facility underlies contamination of the class region(s); (5) whether Gore's conduct caused potential for the intrusion PFOA into the air and potable water of class members; and (6) whether Gore's failure to investigate is emissions, discharge, or disposal of PFOA was negligent.

285.   For the Class (c), the diagnosed illness Class, Plaintiffs seek to bring and maintain the action under Rule 23(c)(4) as a class action with respect to all issues pertaining to the character of Gore's conduct, damages for medical monitoring, and to general causation of the types of illness the Class (c) Plaintiffs allege have been suffered by Class (c) members.

## CAUSES OF ACTION

## COUNT I- STRICT PRODUCTS LIABILITY
## ABNORMALLY DANGEROUS ACTIVITY

286.   Plaintiffs incorporate by reference the allegations above as if fully stated herein.

287.   This Claim is brought under Maryland law.

288.   Defendant Gore's manufacturing processes and negligent, reckless, and/or intentional handling of PFOA solution, APFO, and/or PFOA constituted an abnormally dangerous activity for which Defendant Gore is strictly liable.

289.   Defendant Gore's use and disposal of PFOA solution, APFO, PFOA, or other waste containing PFOA, as described herein, was inappropriate for the place where it was carried out,

especially given the close proximity of the Cherry Hill Facility to Maryland residents, schools, neighborhoods, churches and other retail establishments, and to sources of drinking water relied upon by residents of Elkton and those utilizing its schools, neighborhoods, churches and other retail establishments.

290.    Furthermore, Defendant Gore's use and disposal of PFOA, and reckless disregard for the consequences of those actions, carried a high degree of risk of harm to others and a likelihood that any such harm would be great.

291.    As a result of Defendant Gore's abnormally dangerous activities, Plaintiffs have suffered harm to their property and have suffered and continue to suffer injuries to their bodies and have been forced to mitigate damages as set forth herein, as well as below.

## COUNT II
## NEGLIGENCE AGAINST GORE

292.    Plaintiffs incorporate by reference the allegations above as if fully stated herein.

293.    This Claim is brought under Maryland law.

294.    Defendant Gore knew or should have known that PFOA, APFO, and PTFE dispersions containing PFOA that were used in the manufacturing process at Defendant Gore's Cherry Hill Facility would result in the release of PFOA and APFO into the environment, the contamination of the groundwater, ingestion of the groundwater by the community of Cherry Hill and Elkton, accumulation of PFOA and APFO in the bodies of members of those communities, including Plaintiffs and class members, and adverse health effects to those people, including Plaintiffs and class members.

295.    Defendant Gore knew or should have known that use of PFOA, APFO, and PFOA containing PTFE dispersions and/or the discharge of PFOA and APFO into the air, ground and sewer system was potentially hazardous to human health and the environment and required Defendant to take adequate safety precautions to ensure that PFOA and APFO were not released into the surrounding environment.

296.    Defendant Gore further knew or should have known that it was unsafe and/or unreasonably dangerous to emit large amounts of APFO which affected the air, water, and soil in and around the Gore Cherry Hill Facility and the Cherry Hill and Elkton, Maryland communities.

297.    Defendant Gore further knew or should have known that it was unsafe and/or unreasonably dangerous to use APFO aqueous dispersions and PTFE powders to make ePTFE films and other consumer products, which Defendant Gore did since at least 1980.

298.    Defendant Gore further knew or should have known that the amount of APFO it emitted was unsafe and/or unreasonably dangerous to the Plaintiffs, class members, and the surrounding community.

299.    Defendant Gore further knew or should have known that it was unsafe and/or unreasonably dangerous to permit PFOA and APFO to be emitted without adequate control measures.

300.    At some point in time after use of PFOA at the Cherry Hill Facility began, either based upon information provided by other PFAS manufacturers, or through published and available literature, Defendant Gore knew or should have known of the environmental risks and health hazards associated with exposure of human beings to PFOA and APFO.

301.    Defendant Gore had a duty to take all reasonable measures to ensure that PFOA, APFO, and/or any PFOA-containing PTFE dispersions would be effectively contained and not discharged into the surrounding environment.

302.    Defendant Gore further had a duty to ensure that the manufacturing processes it chose to employ did not unreasonably endanger the drinking water relied upon by the residents of Elkton, including the Plaintiffs and class members, and the surrounding area.

303.    Defendant Gore breached the above-stated duties by unreasonably disposing of PFOA and/or APFO in a manner that guaranteed PFOA would enter the environment, including the groundwater ingested by residents of the Elkton, MD community, including the Plaintiffs and class members.

304.   Defendant Gore had a duty to warn users of the PFOA-containing products of the dangers of releasing PFOA into the environment and breached that duty by failing to disclose information they possessed about the health hazards associated with PFOA exposure, the propensity of PFOA to cause environmental contamination of air, soil and drinking water, and the bioaccumulation of PFOA in people who are exposed to PFOA.

305.   Defendant Gore further breached its continuing duties to warn about the dangers of PFOA learned after the purchase of PFOA and PFOA-containing products.

306.   Defendant Gore breached the above-stated duties by failing to adequately warn and provide sufficient instructions to foreseeable users of PFOA and its PFOA-containing products, including employees handling and disposing of same at the Cherry Hill Facility, to avoid discharging PFOA into the environment where it was likely to enter the groundwater and be ingested by residents of the Elkton, MD community, such as the Plaintiffs and class members.

307.   Had Defendant Gore provided adequate warnings and instructions of the known health hazards and risk of environmental contamination of PFOA and PFOA-containing products to users, governmental agencies and the public, it is more likely than not that the injuries and damages of Plaintiffs and class members would not have occurred or would have been lessened as actions would have been taken to reduce or eliminate Plaintiffs' and class members' exposure to PFOA.

308.   As a result of Defendant Gore's breaches of the various duties set forth above, the drinking water in and around Elkton, Maryland became contaminated with unsafe levels of PFOA which was ingested by Plaintiffs and class members.

309.   Upon information and belief, Defendant Gore was grossly negligent, acted with Reckless indifference to the health and safety of the public, and/or failed to prevent PFOA from being released into the environment and failed to inform the Town of Elkton, residents of the Elkton, MD community, or the public of the potential that PFOA was contaminating its water supply.

310.   As a direct and proximate result of Defendant Gore's actions and omissions described herein, Plaintiffs and class members have suffered illnesses and injuries caused by the accumulation of PFOA in their bodies, entitling them to economic and non-economic compensatory and consequential damages, including the past, present and future cost of medical care; lost earnings and diminished earnings capacity; the cost of medical monitoring; the loss of property value; and severe mental anguish and psychological distress.

## COUNT III

### Private Nuisance Against Defendant Gore

311.   Plaintiffs incorporate by reference the allegations above as if fully stated herein.

312.   This Claim is brought under Maryland law.

313.   Defendant Gore, through its negligent, reckless and/or intentional and unreasonable acts and omissions alleged herein, has contaminated Plaintiffs' and class members' potable water supply, including that accessed through private wells.

314.   Defendant Gore exercised sufficient ownership and/or control over its facilities and dumpsites and could have prevented the injuries suffered by Plaintiffs and class members.

315.   Through Defendant Gore's control over the operation of its facilities, handling and disposal of its toxic waste, and the maintenance of its toxic waste disposal sites, Gore released toxic substances, including PFAS, into the environment.  These toxic substances, including PFAS, eventually migrated and contaminated Plaintiffs' and class members residential wells.

316.   These toxic substances are invasive and have substantially interfered with Plaintiffs' and class members' use and enjoyment of their properties, reduced their property values, and caused them to suffer monetary damages associated with monitoring and remediation of their water supplies.

317.   Defendant Gore, aware of the adverse effects of these chemicals, had a duty to prevent the discharge of such toxic chemicals into the environment, as well as to prevent the toxic chemicals from escaping from the disposal sites into Plaintiffs' and class members' well water.

318.    Defendant Gore owed a duty to take all reasonable and necessary care to prevent Plaintiffs' and class members' water wells from becoming contaminated with dangerous PFAS chemicals.

319.    Neither Plaintiffs nor class members consented to the invasion of toxic chemicals into their well water.

320.    Plaintiffs and class members have property rights and privileges with respect to the use and enjoyment of their properties, including, but not limited to, the water wells on their properties and a right to well water that is not contaminated with harmful chemicals and substances.

321.    Defendant Gore owed a duty to proceed with all reasonable and necessary care to prevent Plaintiffs' and class members' well water from becoming contaminated with dangerous PFAS chemicals.

322.    The wrongful actions of Defendant Gore in causing PFOA and other PFAS chemicals to contaminate Plaintiffs' and class members' well water, and failure to disclose the presence thereof, created a substantial interference with the use and enjoyment of, and physical harm to, Plaintiffs and class members' properties.

323.    The contamination of Plaintiffs' and class members' well water has interfered with their right to use and enjoy their properties. Indeed, this interference is substantial in nature and has caused significant harm. It has caused Plaintiffs and class members to, *inter alia*, refrain from using water to drink, cook, bathe, and all other household purposes, which has, in turn, caused them significant inconvenience and expense. Defendant Gore's interference with the physical condition of the Plaintiffs' and class members' properties has created a disturbance in the comfort and/or conveniences of the properties' occupants, including their peace of mind and threat of future injury that is a present menace and interference with enjoyment.

324.    Defendant Gore's conduct has also substantially interfered with Plaintiffs' and class members' ability to avail themselves of their properties' value as an asset and/or source of

collateral for financing, and to use their properties in the manner that Plaintiffs and class members so choose.

325.    Defendant Gore's negligent, reckless and/or intentional acts and omissions and interference with Plaintiffs' and class members' use and enjoyment of their properties were and continue to be substantial and unreasonable.

326.    Defendant Gore's substantial and unreasonable interference with Plaintiffs' and class members' use and enjoyment of their properties constitutes a nuisance for which Defendant Gore is liable.

## COUNT IV

## Public Nuisance Against Defendant Gore

327.     Plaintiffs incorporate by reference the allegations above as if fully stated herein.

328.    This Claim is brought under Maryland law.

329.    Through Defendant Gore's negligent, reckless and/or intentional conduct described above, it has contaminated both the public land and waterways in Elkton, Cecil County, Maryland.

330.    Defendant Gore's conduct unreasonably interfered with common rights enjoyed by the general public, specifically common rights and privileges with respect to the use and enjoyment of property, and access to safe, potable water.

331.    Gore's conduct, as described above, significantly interferes with public health, safety, peace, comfort, and convenience, as it has caused PFAS and other dangerous toxins to enter natural water sources in Cecil County, Maryland.

332.    Defendant Gore's conduct had a significant adverse effect upon the public right, as it produced the permanent and long-lasting effect of causing PFAS and other dangerous toxins to enter water supplied within Cecil County, Maryland, which the company knew or should have known.

333.    Defendant Gore exercised sufficient ownership and/or control over its facilities and dumpsites such that it could have prevented the injuries suffered by Plaintiffs and class members.

334.    Through its control over the operation of its facilities, the disposal of its toxic waste, and the maintenance of its toxic waste disposal sites, Defendant Gore discharged hazardous chemicals and toxic substances into the environment, including water supplies within Cecil County, Maryland.

335.    Defendant Gore's substantial and unreasonable interference with common rights enjoyed by the general public constitutes a nuisance for which it is liable.

336.    Neither Plaintiffs nor the class members consented to the invasion of toxic chemicals into the public lands and waters of Cecil County, Maryland.

337.    Plaintiffs and class members have a right to the use and enjoyment of their property and public land and waterways, and a right to potable water that is not contaminated with harmful chemicals and substances.

338.    The right to use and enjoy one's property is a right common to the general public.

339.    The right to potable water that is not contaminated with harmful chemicals and substances is a right common to the general public.

340.    Plaintiffs and class members have suffered a harm that is different in kind from others similarly situated within the general public as Plaintiffs' and class members' potable, pubic water sources are contaminated with PFOA and other PFAS chemicals.

**COUNT V**

**Trespass**

341.    Plaintiffs and class members hereby incorporate by reference the allegations set forth as if fully stated herein.

342.    This Claim is brought under Maryland law.

343.    PFOA and PFAS are harmful and noxious substances.

344.    At a minimum, Defendant Gore had some connection with and some control over the release of PFAS into the air and water in and around Plaintiffs' and Class Members' real properties.

345.    Plaintiffs and Class Members of the Property Class each own, occupy, and/or possess real property in and around Elkton, MD.

346.    Through Defendant Gore's negligent, reckless, and/or intentional conduct described above, it has caused PFOA and PFAS to enter onto the real properties owned, occupied, and/or possessed by Plaintiffs and Class Members in that the wells located on said real properties are contaminated with PFOA and other PFAS chemicals.

347.    Defendant Gore's negligent, reckless and/or intentional conduct described above has interfered with Plaintiff's and Class Members' use, possession and enjoyment of their real properties in that Defendant Gore's conduct has reduced their property value, and caused them to suffer monetary damages associated with monitoring and remediation of their water supplies, and reduced or eliminated their use and enjoyment of their properties, including but not limited to necessitating having water lines installed, having piping on their property, having to discontinue use of water from their properties' wells, and the receipt of a monthly water bill for connecting to public water.

348.    The entry and deposit of PFOA and other PFAS chemicals onto said real properties of Plaintiffs by Defendant Gore was done without the authority, permission and/or consent of Plaintiffs.

349.    Defendant Gore's entry and deposit of PFOA and other PFAS chemicals onto said real properties of Plaintiffs and Class Members has proximately caused damages to Plaintiffs and Class Members.

## COUNT VI

## PUNITIVE DAMAGES

## OUTRAGEOUS, WILLFUL, WANTON, CONSCIOUS AND DELIBERATE CONDUCT WITH ACTUAL MALICE AND INTENTIONAL DISREGARD OF HARM

350.   Plaintiffs and class members hereby incorporate by reference the allegations set forth above as if fully stated herein.

351.   This Claim is brought under Maryland law.

352.   The conduct of Defendant Gore as described above and herein was and is outrageous, willful and wanton.  The conduct of the Defendant Gore was undertaken with actual malice, and a conscious, deliberate and intentional disregard for Plaintiffs' and class members' lives.  This conduct was the direct and proximate cause of Plaintiffs' and class members' injuries and damages.

353.   Defendant Gore had actual knowledge, knew and fully understood the toxicity and danger to human life caused by APFO/PFOA at all times by its production and dispersion activities. Armed with that actual knowledge of the toxicity and danger of APFO/PFOA, for over a decade, Defendant Gore continued to utilize it in production and disperse it into the environment.

354.   Defendant Gore knew that its production of PTFE and ePTFE required utilization and processing of the same involved APFO, and APFO dispersions, and that its processing operations included substantial air emissions of PFOA into Elkton and the surrounding community, causing serious injuries to the individuals within it, including the Plaintiffs and class members, yet intentionally, and in bad faith, chose to continue production of its hazardous substances, emitting hazardous substances into the community to incur substantial profit. Defendant Gore did this with conscious, deliberate, and intentional disregard for the serious harm to individuals, including the Plaintiffs and class members, in Elkton, MD and the surrounding community and with conscious, deliberate and intentional disregard for human life. Defendant Gore did so with the express "evil motive" to place profit above human life.

355.   Defendant Gore knew that dumping effluent from the production of PTFE and ePTFE utilizing APFO/PFOA would cause serious injury to individuals, including Plaintiffs and class members in  Elkton, MD and the surrounding community who consumed water from the wells therein, . Defendant Gore did this with conscious, deliberate and intentional disregard for human life, and with the express "evil motive" to place profit above human life.

356.    Defendant Gore knew that medical monitoring was advised at the high levels of PFOA exposure it had subjected Plaintiffs and class members to, and that informing Plaintiffs and class members of their exposure could help identify and prevent injuries and illnesses and allow them to treat said injuries and illnesses so as to save their lives and/or prevent their illnesses from increasing in danger and severity. Despite this knowledge, Defendant Gore chose to conceal Plaintiffs and class members toxic environmental exposures for over a decade, rather than inform Plaintiffs and class members of same so that they could take the appropriate health monitoring precautions. Defendant Gore did this with conscious, deliberate and intentional disregard for human life, and with the express "evil motive" to place profit above human life.

357.    Defendant Gore concealed the toxicity of APFO/PFOA, its use of the toxic substance in its processing operations of PTFE, ePTFE, its air emissions containing the toxic substances, and its dumping of toxic substances, for over a decade, in order to defraud the victims of its punitive conduct, including Plaintiffs and class members, so as to avoid financial responsibility, and worse, to avoid changing its profitable operations to prevent continued harm to human life.

358.    As a direct and proximate result of Defendant Gore's past and continuing, outrageous, willful, wanton, conscious, deliberate and intentional disregard for Plaintiffs' and class members lives, Plaintiffs and the Classes have suffered and continue to suffer damages as set forth herein.

## RELIEF SOUGHT BY PLAINTIFFS AND CLASS MEMBERS

1.      Plaintiffs and class members hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

2.      Plaintiffs and class members have sustained and will continue to sustain damages to their property and health as a result of Defendant Gore's actions. As a result, Plaintiffs and the class members seek monetary damages for each violation set forth in this Complaint.

3.      Plaintiffs and the class members seek monetary damages to compensate class members for the diminution in value of their property caused by Defendant Gore's conduct.

4.      Plaintiffs and the class members seek monetary damages to compensate class members for the loss of the use and enjoyment of their properties caused by Defendant Gore's conduct.

5.      Plaintiffs and the class members seek monetary damages to compensate class members for the loss of quality of life caused by Defendant Gore's conduct.

6.      Plaintiffs and the class members seek consequential damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks posed by PFOA to the class members.

7.      Further, because Defendant Gore's acts were done maliciously, oppressively, deliberately, and in reckless disregard of Plaintiffs and the class members, Defendant Gore's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

8.      In addition to the above, Plaintiffs and the class members seek injunctive relief to establish a biomonitoring protocol for class members of the Class (c) to monitor their health and diagnose at an early stage any ailments associated with exposure, inhalation or ingestion of PFOA.

9.      Leave to amend this Complaint to conform to the evidence produced at trial.

10.     For all other relief as may be appropriate under the circumstances and/or permitted by law or as the Court deems just and proper, whether compensatory, punitive, or declaratory.


BAIRD MANDALAS BROCKSTEDT
& FEDERICO, LLC


/s/ *Philip C. Federico*
Philip C. Federico,  Fed ID No. 01216
Chase T. Brockstedt (Admitted *pro hac vice*)
Brent P. Ceryes, Fed ID No. 19192
Catherine M. Cramer (Admitted *pro hac vice*)
Matthew P. Legg, Fed ID No. 19904
Brian V. DeMott (Admitted *pro hac vice*)
6225 Smith Avenue, Suite 200B
Baltimore, MD 21209
Tel: 410-421-7777
Fax:  410-554-3636
pfederico@bmbfclaw.com

chase@bmbfclaw.com
bceryes@bmbfclaw.com
ccramer@bmbfclaw.com
mlegg@bmbfclaw.com
brian@bmbfclaw.com
*Attorneys for Plaintiffs*


MOTLEY RICE LLC

/s/_____

T. David Hoyle  (Admitted *pro hac vice*)
Anne McGinniss Kearse (Admitted *pro hac vice*)
Rebecca A. Fonseca (Admitted *pro hac vice*)
Kayla E. Lattimore Fed ID No. 30761
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
Tel: (843) 216-9000
Fax: (843) 216-9450
dhoyle@motleyrice.com
akearse@motleyrice.com
rfonseca@motleyrice.com
klattimore@motleyrice.com
*Attorneys for Plaintiffs*


DATED July 31, 2023